# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

UNITED STATES

v.

RAYSHON FRAZIER

No. 3:19-cr-307 (SRU)

## **ORDER**

In the early summer of 2019, law enforcement began investigating the drug dealing activity of Rayshon Frazier's associate and co-defendant, Derrick Stokes.  In early September 2019, Stokes went to prison for a state probation violation.  Using an undercover agent and a confidential source, law enforcement concluded that Stokes was attempting to pass along his drug dealing business to Frazier.  From September 16 through November 15, 2019, law enforcement surveilled Frazier, investigated him, and conducted three controlled purchases from him.  On November 26, 2019, a law enforcement officer submitted an affidavit in support of applications for (1) arrest warrants for Stokes and Frazier on charges related to their alleged drug dealing operation[1] and (2) search warrants for three locations, one of which was Frazier's girlfriend's residence.  The same day, Magistrate Judge Robert M. Spector issued the warrants.

On November 27, 2019, law enforcement officers executed the arrest warrant on Frazier and the search warrant at Frazier's girlfriend's residence.  During the execution of that search warrant, law enforcement officers found over 50 grams of crack cocaine, over 280 grams of cocaine, over $14,500 in United States currency, and two loaded handguns.[2]  Frazier seeks to

---

[1] Frazier's arrest warrant was issued for Conspiracy to Possess and Distribute at least 28 grams of Cocaine Base and Possession with Intent to Distribute Cocaine Base and Distribution of Cocaine Base, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(iii) and 846.  *See* Criminal Compl., Doc. No. 1, at 1.

[2] On December 12, 2019, an indictment was returned against Frazier that charged him with (1) Conspiracy to Possess with Intent to Distribute and Distribution of 28 Grams or More of Cocaine Base, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(iii), and 846; (2) Possession with Intent to Distribute and Distribution of Cocaine Base,

suppress that evidence because the affidavit supporting the government's search warrant application omitted material information that was necessary to Judge Spector's finding of probable cause and issuance of the search warrant. I disagree, and so I **deny** Frazier's motion to suppress, doc. no. 63.[3]

## I.     Standard of Review

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. Thus, the Fourth Amendment forbids "not all searches and seizures, but unreasonable searches and seizures." *United States v. Gori*, 230 F.3d 44, 49 (2d Cir. 2000) (quoting *Elkins v. United States*, 364 U.S. 206, 222 (1960)) (cleaned up). "Absent exigent circumstances or some other exception, the police must obtain a warrant before they enter the home to conduct a search or otherwise intrude on an individual's legitimate expectation of privacy." *Id.* at 50 (citing *Maryland v. Dyson*, 527 U.S. 465, 466 (1999) (per curiam)). In this case, the government does not dispute that it needed a warrant to search Frazier's girlfriend's residence. The government also does not dispute that Frazier has standing to challenge the search.[4] The only dispute is whether the warrant that the government obtained satisfied the Fourth Amendment's requirement that "no Warrants shall issue, but upon probable cause,

---

in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (three counts); (3) Possession with Intent to Distribute 28 Grams or More of Cocaine Base, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(iii); (4) Possession with Intent to Distribute Cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); and (5) Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 924(c)(2).

   [3] On July 31, 2020, Frazier filed his motion to suppress, doc. no. 63, and his memorandum in support of that motion, doc. no. 64. On August 21, the government filed an opposition, doc. no. 66. And on October 13, 2020, I held a hearing on Frazier's motion to suppress. *See* Min. Entry, Doc. No. 68.

   [4] *See* Gov't Opp'n, Doc. No. 66, at 9 n.3; *see also United States v. Hamilton*, 538 F.3d 162, 168 (2d Cir. 2008) (citing *Minnesota v. Olson*, 495 U.S. 91, 99 (1990)) (explaining that a defendant may have a protected privacy interest when he is an overnight guest in someone else's home). Here, the parties agree that Frazier was, at least, an overnight guest at his girlfriend's apartment.

supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.

"[P]robable cause is a fluid concept" that "turn[s] on the assessment of probabilities in particular factual contexts."  *United States v. Clark*, 638 F.3d 89, 94 (2d Cir. 2011) (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)) (cleaned up).  There is probable cause to search "where the totality of circumstances indicates a fair probability that contraband or evidence of a crime will be found in a particular place."  *Id.* (quoting *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007)) (cleaned up).  "In assessing probable cause for purposes of a search, a judge must consider the information in the warrant application in 'a practical, common-sense' manner."  *United States v. Stewart*, 2019 WL 2052136, at *3 (D. Conn. May 9, 2019) (quoting *Gates*, 462 U.S. at 238).  When a neutral and detached magistrate issues a warrant upon a finding of probable cause—as in this case—a reviewing court "must accord considerable deference to the probable cause determination of the issuing magistrate."  *Clark*, 638 F.3d at 93 (quoting *Walczyk*, 496 F.3d at 157).  "[T]he task of a reviewing court is simply to ensure that the 'totality of the circumstances' afforded the magistrate 'a substantial basis' for making the requisite probable cause determination."  *Id.* (quoting *Gates*, 462 U.S. at 238).

"[A] search pursuant to a warrant issued by a judicial officer upon a finding of probable cause is presumptively reasonable."  *Ganek v. Leibowitz*, 874 F.3d 73, 81 (2d Cir. 2017) (citing *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991)).  However, that presumption "can be defeated by showing that the government (1) knowingly and deliberately, or with a reckless disregard of the truth, procured the warrant, (2) based on false statements or material omissions, that (3) were necessary to the finding of probable cause."  *Stewart*, 2019 WL 2052136, at *3 (quoting *Ganek*, 874 F.3d at 81) (cleaned up).  "To determine whether a false

statement was necessary to a finding of probable cause, we consider a hypothetical corrected affidavit, produced by deleting any alleged misstatements from the original warrant affidavit and adding to it any relevant omitted information." *Ganek*, 874 F.3d at 82 (citing *Soares v. Connecticut*, 8 F.3d 917, 920 (2d Cir. 1993)).  If, after considering that hypothetical corrected affidavit, probable cause still exists to issue the warrant, then I should deny Frazier's motion to suppress.

If, on the other hand, after considering that hypothetical corrected affidavit, probable cause does not exist to issue the warrant, I should grant Frazier's motion to suppress unless the "good faith exception" applies.  The good faith exception is "an exception to the exclusionary rule for 'evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant.'"  *Clark*, 638 F.3d at 99 (quoting *United States v. Leon*, 468 U.S. 897, 922 (1984)).  The government bears the burden of showing the officers' good faith reliance.  *See id.* at 100.  There are, however, four exceptions to the good faith exception.  The good faith exception to the exclusionary rule will not apply:

> (1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance on it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable.

*Id.* (quoting *United States v. Moore*, 968 F.2d 216, 222 (2d Cir. 1992)).

"A defendant is permitted to challenge the veracity of a search warrant in limited circumstances," such as "where the affidavit in support of the search warrant is alleged to contain deliberately or recklessly false or misleading information."  *United States v. Canfield*, 212 F.3d 713, 717 (2d Cir. 2000).  Frazier raises such a challenge to the warrant application in this case, and he thus requests an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978).  Under *Franks*, "where the defendant makes a substantial preliminary showing that a

false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." *Franks*, 438 U.S. at 155–56.  As the basis for a *Franks* hearing, "materially misleading omissions as well as misrepresentations may be challenged by the defense." *United States v. Levasseur*, 816 F.2d 37, 43 (2d Cir. 1987); *see also Canfield*, 212 F.3d at 717–18.  "To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine." *Franks*, 438 U.S. at 171.  "There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." *Id.*  "[I]f, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." *Id.* at 171–72.

## II.    Background

Justin B. Lathrop submitted the affidavit in support of the arrest and search warrants sought regarding Frazier.  (I will refer to that affidavit as the "Lathrop Affidavit.")  Lathrop is a city police officer in Middletown, Connecticut, but he is currently deputised to a DEA drug task force.  *See* Lathrop Aff., Ex. 1 in Supp. Frazier's Mem. of Law ("Lathrop Aff."), Doc. No. 64-1, at ¶¶ 1–2.  The Lathrop Affidavit is 31 pages (62 paragraphs) long.  All of the following facts are taken from the Lathrop Affidavit.

In the summer of 2019, Lathrop and other law enforcement officers decided to use a new confidential source (the "CS") to make controlled purchases of crack cocaine from Stokes, whom law enforcement suspected to be a "larger quantity crack cocaine dealer." *See id.* at ¶ 12.  On

July 19, July 26, August 2, and August 27, 2019, law enforcement used the CS and an

undercover officer (the "UC") to arrange and complete controlled purchases of crack cocaine

from Stokes.  *See id.* at ¶¶ 14–28.

On August 2, Stokes was dropped off at the location of the controlled purchase.  *See id.* at

¶ 22.  Law enforcement observed that the car that dropped off Stokes was a "blue Acura sedan

bearing CT registration AC63470."  *Id.*  After the controlled purchase, Stokes got back into the

passenger seat of the same blue Acura, which then drove away.  *Id.*  Law enforcement conducted

a motor vehicle inquiry regarding the blue Acura and learned that it was "registered to Talitha

Hoffler-Frazier," who was "believed to be the mother of Rayshon FRAZIER."  *Id.* at ¶ 23.

"Prior to this controlled purchase, the CS had told the case agents that the CS had seen Rayshon

FRAZIER operating a light blue Acura in the past."  *Id.*  "Case agents believe the blue Acura

sedan observed during the UC purchase on August 2 was being operated by FRAZIER."  *Id.*

Because the UC knew that Stokes would report to prison on September 4 for a state

probation violation, during the August 27 controlled purchase the UC asked Stokes about the

potential continuation of his drug business.  *See id.* at ¶ 28.  Stokes told the UC that, while

Stokes was in prison, "his other 'boy' would take care of the UC."  *Id.*  "STOKES gave the UC a

phone number of 404-971-2895 to contact once he (STOKES) went away to jail."  *Id.*

On September 16, 2019, the UC "started a text message conversation with phone number

404-971-2895" regarding "prices and amounts."  *Id.* at ¶ 31.  The UC and the holder of phone

number 404-971-2895 planned to meet the following day.  *See id.*  Lathrop explains that he

"learned from the CS and from another [law enforcement officer] that Rayshon J. FRAZIER

would be the one who would answer phone number 404-971-2895 and continue the sales of

crack cocaine for STOKES while he was incarcerated."  *Id.* at ¶ 29.  Thus, by September 16,

2019, "[c]ase agents believed the UC was communicating with Rayshon FRAZIER." *Id.* at ¶ 31.

Law enforcement officers provided the UC "with a photograph of FRAZIER and a description of

the blue Acura . . . observed on a previous purchase from STOKES to confirm the identity of the

phone holder of 404-971-2895 and, if possible, the operator of the" blue Acura. *Id.*

      The Lathrop Affidavit describes the September 17 controlled purchase from Frazier as

follows:

32.    On September 17, 2019, at approximately 10:59 A.M., the UC placed a phone call to FRAZIER. The phone call between FRAZIER and the UC to arrange the transaction was recorded. In substance, the UC and FRAZIER discussed their locations, and FRAZIER said he needed an hour or two before they meet [*sic*]. FRAZIER told the UC he had the product for him and wanted to meet later. FRAZIER proposed a meet location of the Brass City Mall in Waterbury as a meet location to conduct the transaction with the UC. They agreed on a time of around 2 hours from the call. At approximately 12:45 P.M. members of the [DEA's New Haven District Office ("NHDO")] set up surveillance in Waterbury near the meet location to cover the meet between the UC and FRAZIER. DEA Airwing was in use and overhead of the area to follow the UC vehicle and cover FRAZIER and the UC while they met. Controlling agents provided the UC with $600.00 in DEA [Official Advanced Funds ("OAF")] and an audio/video recording device. Shortly after, the UC departed the pre-arranged meet location and traveled directly to the Brass City Mall in Waterbury, CT. The UC vehicle was under constant mobile surveillance. At approximately 1:20 P.M. the UC vehicle arrived at the Brass City Mall and parked in the area of the IHOP Restaurant near the front of the mall as discussed with FRAZIER earlier. The UC vehicle was under constant surveillance by mobile units and DEA Airwing.

33.    At approximately 1:41 P.M., a surveillance unit observed FRAZIER's known vehicle, a blue Acura TSX CT registration AC63470 (Target Car) with tinted windows in the parking lot of a housing complex near the intersection of Berk[e]ley Avenue and Long Hill Road. During the course of this investigation it was learned that FRAZIER's girlfriend was believed to live in one of the apartments in the housing complex. At approximately 1:46 P.M., a surveillance unit observed FRAZIER walk to the Target Car carrying a diaper bag. FRAZIER placed the baby bag in the front passenger side door of the Target Car. FRAZIER was wearing a jean jacket and jeans with matching designs, and his hair was tied in long braids. FRAZIER went back into the apartment briefly and came out with something in his hand, but the surveillance unit could not identify what he had in his hand. The surveillance unit was able to observe that the apartment door through which FRAZIER entered and exited was marked 1-

> D. The address FRAZIER left from was verified as 9 Harris Circle, apartment 1-D, Waterbury CT (Target Premises 1).

> 34. At approximately 1:48 P.M., the surveillance unit observed FRAZIER enter the Target Car through the front driver door and leave the area. FRAZIER was the sole occupant of the Target Car. At [a]pproximately 1:53 P.M. surveillance units observed the Target Car enter the mall parking lot near the IHOP and park next to the UC vehicle. . . .

The Lathrop Affidavit then details a controlled purchase in which Frazier supplied the UC approximately 14 grams of crack cocaine in exchange for $550. *See id.* at ¶ 35. The Lathrop Affidavit does not detail where Frazier went after the controlled purchase.

The next controlled purchase that law enforcement arranged with Frazier was on October 10, 2019. The Lathrop Affidavit recounts that controlled purchase as follows:

> 36. On October 9, 2019, members of the NHDO formulated plans to conduct a controlled purchase of one-half (1/2) an ounce of crack cocaine from FRAZIER utilizing the UC. The UC contacted Rayshon FRAZIER at telephone number 404-971-2895. The communications between FRAZIER and the UC to arrange the transaction were recorded. In substance, FRAZIER agreed to sell the UC 14 grams of crack cocaine the following day.

> 37. On October 10, 2019, beginning at approximately 10:16 A.M., the UC and FRAZIER engaged in a text message conversation during which they agreed to meet at the Brass City Mall in Waterbury for the crack cocaine transaction at approximately 11:30 A.M. At approximately 11:00 A.M., controlling agents met with the UC at a pre-arranged location. The UC was provided with $550.00 in OAF and a video/audio recording device. The UC then traveled to the Brass City Mall followed by the controlling agents. Mobile surveillance was also established throughout the mall parking lot. At approximately the same time, a surveillance unit established surveillance at FRAZIER's suspected stash location of 9 Harris Circle, Unit 1-D, in Waterbury (Target Premises 1). At this time, the surveillance unit saw FRAZIER's vehicle, a blue Acura TSX bearing CT registration AC63470 (the Target Car), parked near the intersection of Harris Circle and Berkeley Avenue. The surveillance unit captured FRAZIER leaving Target Premises 1 on video. At approximately 11:24 A.M., the UC texted FRAZIER and advised he had arrived at the mall. At approximately 11:26 A.M., FRAZIER texted the UC and said he was on his way. At approximately 11:35 A.M., the surveillance unit saw FRAZIER exit the Target Premises 1 and walk toward the Target Car. At approximately 11:43 A.M., surveillance units observed the Target Car enter the rear entrance of the mall. . . .

8

The Lathrop Affidavit then details a controlled purchase in which Frazier sold the UC

approximately 14 grams of crack cocaine for $550.  *See id.* at ¶¶ 37–38.  The Lathrop Affidavit

indicates that "[s]urveillance of FRAZIER was terminated at approximately 12:10 P.M."  *Id.* at ¶

37.

The third (and final) controlled purchase that law enforcement arranged with Frazier

occurred on November 15, 2019.  The Lathrop Affidavit describes that controlled purchase as

follows:

> 58.    On November 14, 2019, members of the NHDO formulated plans to conduct a
> controlled purchase of one half (1/2) an ounce of crack cocaine from Rayshon
> FRAZIER utilizing a UC.  The UC contacted Rayshon FRAZIER at telephone
> number 404-971-2895.  The phone calls and/or text messages between
> FRAZIER and the UC to arrange the transaction were recorded.  In substance,
> FRAZIER agreed to sell the UC crack cocaine the following day.  On
> November 15, 2019, beginning at approximately 2:57 P.M., the UC and
> FRAZIER engaged in a text message conversation during which they agreed to
> meet at the Brass City Mall in Waterbury for the crack cocaine transaction at
> approximately 3:30 P.M.  At approximately 2:45 P.M., controlling agents met
> with the UC at a pre-arranged location.  The UC was provided with $550.00 in
> OAF and a video/audio recording device.  The UC then traveled to the Brass
> City Mall followed by the controlling agents.  Mobile surveillance was also
> established throughout the mall parking lot.  At approximately the same time, a
> surveillance unit established surveillance at FRAZIER's suspected stash
> location of 9 Harris Circle, Unit 1-D, in Waterbury (Target Premises 1).  At this
> time, the surveillance unit saw FRAZIER's vehicle, a blue Acura TSX bearing
> CT registration AC63470 (Target Car), parked near the intersection of Harris
> Circle and Berkeley Avenue.

> 59.    At approximately 3:27 P.M., the UC texted FRAZIER and advised that the UC
> would arrive at the mall in 5 minutes.  At approximately 3:28 P.M., FRAZIER
> texted the UC from telephone number 404-971-2895 and agreed on the meet
> time and location.  At approximately 3:31 P.M., surveillance units observed
> FRAZIER exit Target Premises 1,  and walk toward the Target Car.  At
> approximately 3:33 P.M., surveillance units saw FRAZIER's vehicle (Target
> Car) [] travel in the direction of the mall.  At the same time, the DEA Airwing
> maintained surveillance over the Target Car as it traveled toward the mall.  At
> approximately 3:38 P.M., surveillance units observed the Target Car enter the
> rear entrance of the mall.  Approximately two minutes later, surveillance units
> observed the Target Car parked immediately adjacent to the UC vehicle.

FRAZIER then exited its driver's side and got into the front passenger seat of the UC vehicle.  Approximately one minute later, FRAZIER exited the vehicle and got back into the Target Car.  The UC departed the area and traveled to a pre-determined meet location followed by the controlling agents.

60.   At approximately 3:44 P.M., the Airwing followed FRAZIER in the Target Car as he traveled back to the area of Target Premises 1, parked the Target Car on Berk[e]ley Avenue, and walked toward Target Premises 1.  Surveillance did not observe what door FRAZIER entered at the residence.  Surveillance of FRAZIER was terminated at 3:55 P.M.

The Lathrop Affidavit also describes that, during the course of their investigation into Stokes and Frazier, law enforcement obtained and reviewed recordings of prison phone calls between Stokes (in prison at the time) and a person believed to be Frazier. Based on those conversations,[5] law enforcement concluded that "STOKES and FRAZIER are . . . communicating over 475-775-0350 regarding the continuation of STOKES's drug trafficking business."  *Id.* at ¶ 39.  "The DOC phone log shows phone number 475-775-0350 as belonging to Yahaira Ramirez," who is the "known girlfriend of Rayshon FRAZIER and one of the occupants of Target Premises 1 [9 Harris Circle, Apartment 1-D], along with FRAZIER and a newborn child he has with Ramirez."  *Id.* The Lathrop Affidavit also says:  "Both FRAZIER and Ramirez have been observed by agents entering and leaving Target Premises 1 during the investigation."  *Id.*

### III.   Discussion

A.   Parties' Arguments

Frazier argues that, in two instances, the Lathrop Affidavit misled Judge Spector either intentionally or by recklessly disregarding the truth.  More specifically, Frazier claims that "[w]ith respect to both the September 17 and (more egregiously) the November 15 events, the

---

[5]   The Lathrop Affidavit details two calls—on September 8 and October 2, 2019—in which Stokes called 475-775-0350 and then spoke with a person believed to be Frazier about the drug business in what might be understood as coded language.  *See* Lathrop Aff., Doc. No. 64-1, at ¶¶ 40–45.

affidavit is deliberately misleading in a manner that materially exaggerates the relationship

between 9 Harris Circle Apartment 1-D and Mr. Frazier's alleged drug sales."  Frazier's Mem. of

Law in Supp. Mot. to Suppress ("Frazier's Mem. of Law"), Doc. No. 64, at 9.  At the hearing in

this matter, Frazier clarified that he does not claim that the Lathrop Affidavit contains any

misstatements, but, rather, that it omits highly relevant information that makes the Lathrop

Affidavit, as it was submitted, materially misleading.[6]

Regarding the September 17 controlled purchase, Frazier claims that the Lathrop

Affidavit "creates the impression that in the time period leading up to 1:46 PM, Mr. Frazier was

at 9 Harris Circle, apartment 1-D."  Id.  In fact, though, law enforcement "knew full well that

Rayshon Frazier was not at 9 Harris Circle apartment 1-D when he spoke with the undercover

officer or for most of the intervening time between that call [at 10:59 a.m.] and the controlled

purchase."  Id. at 9–10.  Instead, law enforcement knew that, during the interim, Frazier needed

to "pick [his] son up from the hospital."  Id. at 10.  Indeed, in a 1:05 p.m. call, Frazier explained

to the UC that he was leaving the University of Connecticut Health Center in Farmington,

Connecticut.  Id. at 10.  But the Lathrop Affidavit included none of that information.  Instead, the

Lathrop Affidavit said simply that, at approximately 1:41 p.m., a surveillance unit observed

Frazier's vehicle "in the parking lot of a housing complex near the intersection of Berk[e]ley

Avenue and Long Hill Road."  Lathrop Aff., Doc. No. 64-1, at ¶ 33.  Really, though, the

surveillance unit observed Frazier's vehicle *arrive* at that time.  Frazier's Mem. of Law, Doc.

No. 64, at 10.  Frazier argues that his brief presence at 9 Harris Circle "was easily explained by

his need to drop his son and his son's mother off at her apartment."  Id.  Frazier argues that an

---

[6]  The transcript from the hearing on Frazier's motion to suppress is not yet available on this case's public docket.  I have reviewed the court reporter's rough draft of the transcript.

evidentiary hearing is necessary "to determine the exact nature of law enforcement's knowledge of Mr. Frazier's movements at this time." *Id.*

The government concedes that law enforcement saw Frazier's vehicle *arrive* at 9 Harris Circle at 1:41 p.m. *See* Gov't Opp'n, Doc. No. 66, at 12–13. However, the government maintains that law enforcement did not see Frazier's girlfriend or baby, and so the Lathrop Affidavit is not inaccurate in that respect. *See id.* at 13. The government concludes: "Although the affidavit could have more clearly stated that [law enforcement] observed the Acura arrive at the parking lot at 1:41 pm, it was very specific about the brief amount of time that Frazier was in the apartment." *Id.*

Regarding the November 15 controlled purchase, Frazier claims that the Lathrop Affidavit was extremely misleading because it suggested that law enforcement observed Frazier most likely returning to his girlfriend's residence at 9 Harris Circle after the controlled purchase. *Id.* at 11. However, according to Frazier, law enforcement actually "knew with certainty" that Frazier went to a *different* apartment: Video surveillance footage shows that, "upon returning to the vicinity of Harris Circle, Mr. Frazier did not go to the location of the complex where 9 Harris Circle was located, let alone approach Apartment 1-D." *Id.* "Instead, the video demonstrates that he walked to an entirely different part of the complex and walk[ed] towards an entirely different apartment." *Id.* Although Frazier concedes that "[a] stairway blocks the surveillance view of Mr. Frazier's final approach to a specific apartment . . . , the unit Mr. Frazier approached was consistent not with 9 Harris Circle 1-D but with 23 Harris Circle 1-D." *Id.* Frazier explains that 23 Harris Circle 1-D was *his own apartment*, where he was the registered tenant. Law enforcement could have discerned that through simple investigation. *See id.* Frazier requests a *Franks* hearing to "determine whether at the time of swearing the affidavit law enforcement had

12

taken the minimal investigative steps needed to determine that Mr. Frazier was in fact the official tenant of this alternate apartment." *Id.* at 11–12.

Frazier argues that, had the Lathrop Affidavit included the omitted information, the warrant application would lack probable cause to establish the necessary "nexus" between 9 Harris Circle and Frazier's drug dealing activity. The Fourth Amendment's particularity requirement mandates that, for a warrant to issue, there must be a "nexus between the items sought and the 'particular place' to be searched." *Clark*, 638 F.3d at 94 (cleaned up); *see also United States v. Singh*, 390 F.3d 168, 182 (2d Cir. 2004) ("A showing of nexus does not require direct evidence and may be based on reasonable inference from the facts presented based on common sense and experience.") (cleaned up). Although Frazier admits that "[u]nder some circumstances, travel to and from a location to controlled purchases can support the existence of the required nexus," Frazier argues that this case does not present one of those circumstances. Frazier's Mem. of Law, Doc. No. 64, at 13.

Frazier relies on two cases to make his point. The first is *United States v. Rios*, 881 F. Supp. 772 (D. Conn. 1995). Frazier relies on *Rios* for the proposition that a nexus between a defendant's criminal activity and the place to be searched must be based on specific observations and not only on general knowledge. In *Rios*, the district court held that the relevant law enforcement affidavit did not adequately establish a nexus between the defendant's criminal activity and his residence. 881 F. Supp. at 774–77.[7] In *Rios*, a law enforcement officer submitted a sixty-nine page affidavit in support of a search warrant application, but "the only allegations to suggest that evidence of Rios's alleged criminal activity would be located in his home are [the law enforcement officer's] general averments based on her training and

---

[7] The *Rios* Court ultimately denied the defendant's motion to suppress by applying the good faith exception to the exclusionary rule. *Rios*, 881 F. Supp. at 777–78.

experience." *Id.* at 774–75.  The *Rios* Court held that a law enforcement officer's generalized

knowledge of large-scale drug traffickers cannot, alone, "provide an adequate basis for a

determination that probable cause exists to search the residence of an individual suspected to be

involved in drug trafficking." *Id.* at 775.

Second, Frazier cites to *United States v. Bell,* 382 F. Supp. 3d 574 (N.D. Tex. 2019).  In

*Bell*, a district court granted the defendant's motion to suppress evidence seized from a residence

associated with the defendant.  *See* 382 F. Supp. 3d at 576–77.  The warrant application in *Bell*

was supported by an affidavit from a law enforcement officer who had conducted three

controlled purchases from the defendant.  The residence to be searched was the defendant's "last

known address," and, before the final controlled purchase, narcotics detectives surveilled that

residence.  *Id.* at 578.  Law enforcement observed the defendant arrive at the residence, spend

about an hour there, and then leave and travel straight to the controlled purchase.  *See id.* at 578–

79.  The *Bell* Court held that the affidavit in support of the search warrant application lacked

sufficient indicia of probable cause because "[t]he salient facts of the affidavit were that Bell

sold small amounts of methamphetamine[8] and spent a short amount of time" at the relevant

residence.  *Id.* at 583.  Indeed, at a hearing on the motion to suppress, the law enforcement

officer admitted that "the statements in the affidavit that he believed certain drug-trafficking

evidence would be in the [relevant residence] were based solely on his general experience and

not because of something specific to Bell."  *Id.* at 584.

Frazier argues that the situation in *Bell* is analogous to the situation in this case.

According to Frazier, the connection between 9 Harris Circle and Frazier's drug activity is thin:

"No drug transactions were ever allegedly conducted there, nor did investigative methods such as

---

[8] Across the three controlled purchases, the defendant in *Bell* sold 13.8 grams of methamphetamine.  *See*
*Bell*, 382 F. Supp. 3d at 578–79.

trash pulls supply evidence that contraband would be found at the apartment." Frazier's Mem. of Law, Doc. No. 64, at 14. Further, Frazier argues, "information known (or easily knowable) to law enforcement but in some cases excluded from the affidavit show that there were several [] locations other than 9 Harris Circle Apt. 1-D that could have been the location where Mr. Frazier held drugs," such as 23 Harris Circle. *Id.* The existence of Frazier's own apartment proximate to his girlfriend's, in Frazier's view, "significantly diminishes the intuitive link between 9 Harris Circle Apt. 1-D and Mr. Frazier's alleged drug dealing." *Id.*

The government takes a different view. The government explains that the Lathrop Affidavit "was clear about what the surveilling agents could and could not observe." Gov't Opp'n, Doc. No. 66, at 13. More specifically, "[a]fter Frazier sold the UC 14 grams of crack cocaine at the mall, DEA Airwing surveillance followed his vehicle back 'to the area of' 9 Harris Circle, where he parked and walked toward the apartment building." *Id.* at 14. "The affidavit specifically noted that surveillance 'did not observe' what door Frazier entered at the residence." *Id.* Although Frazier claims that law enforcement knew that Frazier actually walked into his own apartment at 23 Harris Circle, the government explains that law enforcement did not know that Frazier had such an apartment until they found a utility bill with Frazier's name and the 23 Harris Circle address while executing the search warrant at 9 Harris Circle. *See id.* at 1–2, 6, 15.

The government also points out that law enforcement's oversight was not due to investigative carelessness. The government explains that in early August 2019, agents ran a search for Frazier in a law enforcement database, and that search indicated that Frazier was associated with four addresses in Meriden and one in New Britain but *none* in Waterbury or near Harris Circle. *See id.* at 14; *see also* Report, Ex. 4 in Supp. Gov't Opp'n, Doc. No. 66-1, at 20–21. Further, the government points out that the address listed on Frazier's driver's license was

not 23 Harris Circle.  *See* Gov't Opp'n, Doc. No. 66, at 14.[9]  The government also argues that

law enforcement's confusion was even more understandable because 9 Harris Circle and 23

Harris Circle were adjacent structures "adjoined at the basement level."  *See id.* at 15 (citing map

of area around Harris Circle and recent telephonic interview with deputy director of Waterbury

Housing Authority).  Thus, the Lathrop Affidavit's oversight was due to negligence or innocent

mistake, neither of which can rebut the presumption of validity that attaches to an affidavit

supporting a search warrant application.  *See id.* at 16 (citing *Franks*, 438 U.S. at 171).

The government also argues that, even if I agreed with Frazier that the Lathrop Affidavit

was intentionally or recklessly misleading, I should deny Frazier's motion to suppress.  That is

because, even considering a hypothetical affidavit that included any material omitted

information, the Lathrop Affidavit still would have provided ample probable cause for Judge

Spector to issue the search warrant.  The government explains:

> [T]he affidavit set forth in fulsome detail the three surveilled undercover purchases
> from Stokes (including one in which Stokes was transported in Frazier's vehicle);
> the three surveilled undercover purchases from Frazier, during which Frazier
> consistently left 9 Harris Circle Apartment 1-D, drove to the Brass City Mall in the
> Acura TSX and sold 14 grams of crack to the UC for $550; and Stokes's jail calls
> to Frazier at the telephone number identified as belonging to Yahaira Ramirez,
> Frazier's girlfriend and one of the occupants of 9 Harris Circle, Apartment 1-D.
> Frazier makes no attempt to contest the affidavit's description of the October 10,
> 2019, undercover purchase.  All of this evidence was more than sufficient to support
> the issuance of the warrant for that apartment.

Gov't Opp'n, Doc. No. 66, at 17.  Finally, the government argues that, if all else fails, the good

faith exception to the exclusionary rule applies because law enforcement did not intentionally

---

[9]  Although the government makes that point in its briefing, the government does not indicate that law enforcement queried the DMV's database for Frazier's address during their investigation in this case.

The government also points out that Frazier's own exhibits indicate that his lease term at 23 Harris Circle began on July 22, 2019.  *See* Lease, Ex. 7 in Supp. Frazier's Mem. of Law, Doc. No. 64-1, at 47.  Because under Connecticut law a resident must notify the DMV within 48 hours of changing address, *see* Conn. Gen. Stat. § 14-45(a)(1), the government argues that it was Frazier's fault—not the government's—that law enforcement did not know Frazier had an alternate apartment in Harris Circle.  *See* Gov't Opp'n, Doc. No. 66, at 14.

mislead Judge Spector.  *See id.* at 18.  The government also argues that Frazier is not entitled to a *Franks* hearing because he has not made the necessary "substantial preliminary showing."

> B.  The Warrant is Valid Because a Hypothetical Affidavit Including the Alleged Omissions Would Still Support a Finding of Probable Cause.

In my view, the Lathrop Affidavit displays only negligence in its omission regarding the September 17 controlled purchase.  The Lathrop Affidavit recounted that the controlled purchase was arranged in a 10:59 a.m. phone call.  Lathrop Aff., Doc. No. 64-1, at ¶ 32.  The Lathrop Affidavit explained that at 1:41 p.m., law enforcement "observed" Frazier's Acura "in the parking lot" of the Harris Circle complex.  *Id.* at ¶ 33.  The Lathrop Affidavit further stated that at 1:46 p.m., law enforcement "observed FRAZIER walk to the Target Car carrying a diaper bag" and "place[] the baby bag in the front passenger side door."  *Id.*  "FRAZIER went back into the apartment briefly and came out with something in his hand, but the surveillance unit could not identify what he had in his hand."  *Id.*  Frazier then got in his car and drove straight to the controlled purchase.

Frazier complains that it would have been more accurate for the Lathrop Affidavit to say that Frazier *arrived* at Harris Circle at 1:41 pm.  Indeed, Frazier points out that the government knew where Frazier was that late morning and early afternoon:  Picking up his young son from the University of Connecticut Health Center in Farmington.  Frazier argues that "his presence at [9 Harris Circle] was easily explained by his need to drop his son and his son's mother off."  Frazier's Mem. of Law, Doc. No. 64, at 10.  The government concedes that Frazier did "arrive" at 1:41 p.m. and that the Lathrop Affidavit should have reflected that fact.  *See* Gov't Opp'n, Doc. No. 66, at 12–13.  But the government denies that Frazier's girlfriend or son was with him.  *See id.* at 13.

It was certainly negligent for the Lathrop Affidavit not to reflect that Frazier only *arrived* at 1:41 pm.  The government acknowledges as much.  However, in my view, the Lathrop Affidavit did not show "reckless disregard" for the truth in omitting that fact.  To hold that an affiant for a warrant application showed reckless disregard for the truth, "the reviewing court must be presented with credible and probative evidence that the omission of information in a[n] . . . application was designed to mislead or was made in reckless disregard of whether it would mislead."  *United States v. Rajaratnam*, 719 F.3d 139, 154 (2d Cir. 2013) (quoting *United States v. Awadallah*, 349 F.3d 42, 68 (2d Cir. 2003)) (stating that rule in the context of a wiretap application) (cleaned up).  Frazier argues that the omission tends to exaggerate the nexus between 9 Harris Circle and Frazier's drug dealing activity.  But, as discussed further below, Frazier does not challenge the fact that he went to 9 Harris Circle before the September 17 controlled purchase and went straight from 9 Harris Circle to the controlled purchase.  Those facts are by far more important to a probable cause determination than whether Frazier was at 9 Harris Circle for five minutes or two hours and whether he arrived with his girlfriend and their child.  Further, it is possible that the Lathrop Affidavit did not mention Frazier's picking up his son because, in Officer Lathrop's view, it was irrelevant personal information.[10]  Indeed, "[a]n affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation."  *Awadallah*, 349 F.3d at 67–68 (quoting *United States v. Colkley*, 899 F.2d 297, 300–01 (4th Cir. 1990)) (cleaned up).  Thus, the government's omission with respect to the September 17 controlled purchase does not rebut the presumptive reasonableness of the search.

---

[10]  The DEA reported on Frazier's pre-sale whereabouts in its Form 6.  *See* DEA Form 6, Ex. 1 in Supp. Gov't Opp'n, Doc. No. 66-1, at 4 ("FRAZIER said he needed an hour or two before they meet [*sic*] because he had to go pick up his son because he just had a baby.").  The Lathrop Affidavit includes portions of the DEA Form 6 verbatim, but omits most of the Form 6, which is itself seven (7) pages long.

The Lathrop Affidavit's omission with respect to the November 15 controlled purchase is a different story. The Lathrop Affidavit explained that, after the November 15 controlled purchase was completed, aerial surveillance "followed FRAZIER in the Target Car as he traveled back to the area of Target Premises 1, parked the Target Car on Berk[e]ley Avenue, and walked toward Target Premises 1." Lathrop Aff., Doc. No. 64-1, at ¶ 60. The Lathrop Affidavit continued: "Surveillance did not observe what door FRAZIER entered at the residence. Surveillance of FRAZIER was terminated at 3:55 P.M." *Id.* Frazier claims that law enforcement in fact "knew with certainty" that Frazier did not return to 9 Harris Circle but, in fact, went to his *own* apartment at 23 Harris Circle. Frazier relies on the DEA's aerial video surveillance (and a map) to establish that fact. The government argues that 23 Harris Circle and 9 Harris Circle are adjacent and conjoined at the basement and that the Lathrop Affidavit was "clear about what the surveilling agents could and could not observe." Gov't Opp'n, Doc. No. 66, at 13. The government explains that its confusion was especially understandable given that it did not know that Frazier had an apartment in 23 Harris Circle until agents found a utility bill while executing the search warrant at 9 Harris Circle. *See id.* at 1–2, 6, 15.

I have reviewed the aerial video surveillance and maps submitted by the parties, and I agree with Frazier that the Lathrop Affidavit displayed a reckless disregard for the truth when it said that law enforcement "did not observe what door FRAZIER entered" upon his return to the Harris Circle area. Although 9 Harris Circle and 23 Harris Circle may be physically adjacent and "adjoined at the basement," they are separate structures. *See* Berkeley Heights Development Map, Ex. 6 in Supp. Frazier's Mem. of Law, Doc. No. 64-1, at 44–45; Gov't Opp'n, Doc. No. 66, at 15 (annotating Frazier's map submission); *see also* DEA Aerial Surveillance, Ex. 5 in Supp. Frazier's Mem. of Law ("DEA Aerial Surveillance"), Doc. No. 64-1, at 1:35; Appendix A.

Aerial surveillance video makes extremely clear that Frazier did not walk into 9 Harris Circle. *See* DEA Aerial Surveillance, Doc. No. 64-1, at 42.  Indeed, Frazier walks to the side of 23 Harris Circle that is *farthest away* from 9 Harris Circle.  *Id.*; *see also* Appendix A.  Although aerial surveillance is obstructed when Frazier literally enters an apartment door, it is quite certain from the surveillance video that Frazier has entered 23 Harris Circle.  In omitting that clear fact—and, instead, reporting that Frazier "walked toward" 9 Harris Circle but that "[s]urveillance did not observe what door FRAZIER entered at the residence"—the Lathrop Affidavit was recklessly misleading.  Lathrop Aff., Doc. No. 64-1, at ¶ 60.  It is *possible* that law enforcement was simply confused about where Frazier had gone.  But the aerial video surveillance makes quite clear that Frazier entered 23 Harris Circle.  Thus, I agree with Frazier that it is reasonable to infer that the Lathrop Affidavit omitted that fact to avoid complicating the investigative narrative that justified issuance of a search warrant for 9 Harris Circle.  The Lathrop Affidavit's omission of Frazier's true whereabouts after the November 17 controlled purchase showed a reckless disregard for the truth.

Even so, I deny Frazier's motion to suppress because, considering a hypothetical affidavit that includes the omitted information described above, probable cause exists to support the issuance of a search warrant at 9 Harris Circle.  Assuming *arguendo* that the two omissions identified above were included,[11] the hypothetical Lathrop Affidavit would read as it does now except that:

- With respect to the September 17 controlled purchase, the Lathrop Affidavit would clearly indicate that Frazier *arrived* at 9 Harris Circle at 1:41 p.m. and was, in the two hours before, engaged in a personal errand regarding his newborn son in Farmington, Connecticut.

---

[11]  Of course, I have held that only one of the two omissions was omitted recklessly.

- With respect to the November 15 controlled purchase, the Lathrop Affidavit would clearly indicate that Frazier returned to his own apartment at 23 Harris Circle rather than 9 Harris Circle.

Such an affidavit would still provide probable cause to issue a search warrant for 9 Harris Circle Apartment 1-D because a practical, common sense consideration of the hypothetical Lathrop Affidavit indicates a fair probability that Frazier used 9 Harris Circle as a stash house. "Probable cause to search a location for contraband following a sale of narcotics may be established by observations of the seller going to the location immediately before or after the sale." *Stewart*, 2019 WL 2052136, at \*4; *see also* Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 3.7(d) nn. 200–01 (6th ed. 2020) (collecting cases); *United States v. Coleman*, 923 F.3d 450, 457 (6th Cir. 2019) (holding that nexus existed to search defendant's residence when, among other reasons, "agents had conducted three controlled buys of cocaine from Coleman and observed him drive directly from his condo to the site of the most recent buy"); *United States v. Dixon*, 787 F.3d 55, 60 (1st Cir. 2015) (holding that nexus existed when, in part, "[o]fficers observed Dixon returning to 12 York Street immediately after all three controlled buys and observed him leaving there to go to the last two controlled buys"); *United States v. Farmer*, 543 F.3d 363, 377 (7th Cir. 2008) (holding that nexus existed to search defendant's residence based, in part, on fact that defendant's cousin stopped at defendant's residence after informant requested to buy drugs from defendant's cousin and, after leaving, defendant's cousin "met with the informant with freshly cooked crack cocaine"); *United States v. Walker*, 776 F. App'x 784, 786 (3d Cir. 2019) (holding that nexus existed when, among other reasons, defendant "was seen leaving the house immediately before selling drugs to the informant"). The facts that Frazier was at 9 Harris Circle immediately before each controlled

purchase and drove directly to the controlled purchases contribute significantly to finding probable cause to search 9 Harris Circle; indeed, they may alone constitute probable cause.

In addition, Frazier's traveling directly from 9 Harris Circle to controlled purchases on three occasions are not the only facts establishing the nexus between 9 Harris Circle and Frazier's drug dealing activity. Specifically, the Lathrop Affidavit explains that, when Stokes was in prison, he and Frazier communicated by telephone about Stokes's drug business. To reach Frazier, Stokes called a phone number belonging to Yahaira Ramirez, Frazier's girlfriend and "one of the occupants of" 9 Harris Circle. Lathrop Aff., Doc. No. 64-1, at ¶ 39. It is possible that the number Stokes called was Ramirez's home phone number. If so,[12] a strong inference arises that Frazier conducted his own drug dealing business out of 9 Harris Circle. Even if the number Stokes called was Ramirez's mobile number, the inference is still strong: The fact that Frazier involved Ramirez's personal phone in dealing with Stokes, taken together will all the other evidence, suggests that both drugs and drug proceeds might be found at 9 Harris Circle.

The additional information in the hypothetical Lathrop Affidavit does not significantly detract from all those probative facts. The addition regarding the September 17 controlled purchase does not make the nexus between 9 Harris Circle and Frazier's drug dealing activity much (if at all) weaker. As I remarked at the hearing in this matter, the fact that Frazier needed to stop momentarily at 9 Harris Circle before driving directly to the site of the controlled purchase may have made the intuitive link between 9 Harris Circle and Frazier's drug dealing activity *stronger* because it suggests that there was something Frazier needed at 9 Harris Circle (say, drugs) before going to the controlled purchase.

---

[12] The parties do not clarify that fact.

22

Likewise, the additional information regarding the November 15 controlled purchase does not much weaken the nexus between 9 Harris Circle and Frazier's drug dealing activity. The hypothetical corrected Lathrop Affidavit—in noting that Frazier returned to 23 Harris Circle rather than 9 Harris Circle—raises the possibility that Frazier may have been storing drugs or drug proceeds at 23 Harris Circle. But that possibility does not negate the inferences regarding the nexus between 9 Harris Circle and Frazier's drug dealing activity. At the hearing in this matter, Frazier's attorney argued otherwise. He claimed that Frazier's returning to 23 Harris Circle rather than 9 Harris Circle after the November 15 controlled purchase diminished the intuitive link between Frazier's drug dealing activity and 9 Harris Circle. To make that point, Frazier's attorney posed a hypothetical in which a defendant stopped at ten difference places before arriving at a drug deal. Frazier's attorney reasoned that the nexus between that defendant's drug dealing and any one of those ten places would be very thin. Similarly here, Frazier's lawyer argues: Because Frazier was associated with *two* different addresses in the same vicinity (9 Harris Circle and 23 Harris Circle), the intuitive link between either of them and Frazier's drug dealing is weakened.

As I mentioned at the hearing, I do not follow that logic, and the hypothetical does not remotely resemble the facts of this case. In this case, on three separate occasions, law enforcement observed Frazier at 9 Harris Circle immediately before a controlled purchase. Each time, Frazier travelled directly from 9 Harris Circle to the controlled purchase. Law enforcement thus observed a pattern: Frazier was at 9 Harris Circle immediately before drug deals and then travelled directly to those drug deals. The fact that on the third occasion Frazier returned to 23 Harris Circle is, in my view, of quite limited import. First, Frazier likely did not have drugs on his person after the November 15 controlled purchase: He had just traded drugs for money.

23

Second, even if Frazier may have been storing more drugs at 23 Harris Circle, a drug dealer may have multiple stash houses.  That is, Frazier may have been storing drugs in several places, including *both* 9 Harris Circle and 23 Harris Circle.  To the extent that Frazier argues that law enforcement should have looked further into Frazier's connection to 23 Harris Circle (which turned out to be his own apartment), Frazier merely disagrees with law enforcement's method of investigation.  It also bears mentioning that law enforcement's investigation did not begin and end with 9 Harris Circle:  Law enforcement also obtained warrants to search Frazier's car and another individual's residence.[13]  In sum:  Frazier's returning to 23 Harris Circle after the November 15 controlled purchase does not meaningfully diminish the probable cause nexus between 9 Harris Circle and Frazier's drug dealing activity.

As the above recounting suggests, I disagree with Frazier's analogies to *United States v. Rios* and *United States v. Bell*.  In *Rios*, the government admitted that the nexus between the defendant's criminal activity and the place to be searched (the defendant's residence) was established *only* by the law enforcement officer's general knowledge and not by any observation during that particular investigation.  991 F. Supp. at 775 ("[T]he court emphasizes that [the law enforcement officer's] affidavit contains *no facts* to support an inference that evidence of Rios's criminal activity would be found at his home.").  In contrast, as discussed above, law enforcement in this case on three occasions observed Frazier leave 9 Harris Circle and drive directly to a controlled purchase.  The analogy is thus inapposite.

In *Bell*, law enforcement observed Bell leave a residence and travel straight to a drug deal on one occasion.  At a later hearing, the law enforcement officer who submitted the affidavit

---

[13]  *See* Locations to Be Searched, Attachment A to Lathrop Aff., Ex. 1 in Supp. Frazier's Mem. of Law, Doc. No. 64-1, at 31 (listing three locations to be searched).  The other residence to be searched was the residence of Erica Rivera, who was an associate of Stokes; law enforcement apparently believed that the proceeds from Stokes's drug sales were at Ms. Rivera's residence.  *See, e.g.*, Lathrop Aff., Doc. No. 64-1, at ¶ 46.

supporting the warrant application in that case admitted that "the statements in the affidavit that he believed certain drug-trafficking evidence would be in the [residence to be searched] were based solely on his general experience and not because of something specific to Bell." *Bell*, 382 F. Supp. 3d at 584.  The *Bell* Court also commented that the nexus between the residence and Bell's drug dealing activity was weak because the small amounts of drugs that Bell had sold—in three deals, a total of 13.8 grams of methamphetamine—made it even less likely that Bell was storing drugs in that residence. *Id.* at 583.

*Bell* is also inapposite.  First, and most obviously, law enforcement in this case observed Frazier leave 9 Harris Circle and drive directly to a drug deal on *three occasions*, rather than just once.  Second, Frazier was involved in more significant sales than was Bell—in the three controlled purchases, Frazier sold approximately 42 grams of crack cocaine (approximately 14 grams on each occasion)—and so it was more reasonable to infer that Frazier was storing drugs at 9 Harris Circle.

Finally, because I hold that the search warrant for 9 Harris Circle was supported by probable cause, I need not address whether the good faith exception to the exclusionary rule applies. *See United States v. Morris*, 509 F. App'x 58, 61 (2d Cir. 2013).

C. No *Franks* Hearing is Necessary.

Because I hold that the corrected, hypothetical Lathrop Affidavit would also supply probable cause to issue a search warrant for 9 Harris Circle, I hold that no *Franks* hearing is necessary. *See Franks*, 438 U.S. at 171–72 ("[I]f, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required."); *see also United States v. Long*, 678 F. App'x 31, 35 (2d Cir. 2017) (holding that the district court did not err in denying

a *Franks* hearing when the defendant "failed to show that any . . . omission was necessary to the finding of probable cause") (cleaned up).

**IV.      Conclusion**

Frazier's motion to suppress, doc. no. 63, is denied.

IT IS SO ORDERED.

Dated at Bridgeport, Connecticut, this 23d day of October 2020

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge